UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
UNITED STATES OF AMERICA, :
:
v. : **MEMORANDUM AND ORDER**
: 21-CR-497 (WFK)
KEMAL SARKINOVIC, :
:
Defendant. :
---------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

On March 3, 2022, Defendant pled guilty to one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349. Agreement (the "Plea") ¶ 1, ECF No. 75; Indictment ¶¶ 32–33.[1] The Court now sentences Defendant and provides a complete statement of reasons, under 18 U.S.C. § 3553(c), of those factors set forth by Congress in 18 U.S.C. § 3553(a). For the reasons set forth below, Defendant is hereby sentenced to time served and a $100.00 mandatory special assessment.

## I. Background

### A. Factual Background

#### 1. *The Underlying Check-Cashing Scheme*

Defendant and others helped carry out a fraudulent scheme organized by co-defendant David Motovich ("Motovich"). Motovich operated Midwood Lumber, a family-run business which sold building materials and equipment to contractors operating in the New York City metropolitan area. Presentence Investigation Report (the "PSR") ¶ 4, ECF No. 405. Alongside the operation of his family business, Motovich ran an illegal, underground check-cashing business since at least 2012 (the "Midwood Check-Cashing Business"). *Id.*

The Midwood Check-Cashing Business did not abide by applicable federal regulations governing check cashers.[2] Check cashers have disclosure obligations to prevent illegal activity

---

[1] Citations are to the docket in *United States v. Motovich, et al.*, 21-CR-497. Page pincites refer to the ECF page numbers assigned to a filing where available, and where no ECF heading is present, to the page numbers listed in the original filing.

[2] By definition, "check cashers" are persons in the business of "accept[ing] checks . . . in return for currency or a combination of currency and other monetary instruments or other instruments, in any

(e.g., money laundering, sanctions evasion, and terrorism), such as registering with the United States Department of Treasury's Financial Crimes Enforcement Network (FinCEN) and filing Currency Transaction Reports for movements of currency greater than $10,000.00. *See id.* ¶¶ 13–14. Customers of the Midwood Check-Cashing Business—who were primarily owners and operators of construction-related businesses themselves—used Motovich's services to pay their employees in cash, to avoid reporting wages to the Internal Revenue Service, and to evade paying Federal Insurance Contribution Act (FICA) taxes. *See id.* ¶ 16.

2. *Defendant's Involvement*

To conceal the illegal conduct, Defendant and others—at Motovich's direction—incorporated numerous shell companies and bank accounts which had no legitimate business purpose. *See id.* ¶¶ 18–19, 24, 33. The shell companies often copied the names of existing businesses, lending them an air of legitimacy. *Id.* ¶ 19.

Defendant worked as a self-employed handyman since immigrating to the United States in 1979. *Id.* ¶ 75; Sec. Add. PSR ¶ 65, ECF No. 455.[3] He received much of his work through Motovich and Motovich's associates. *See* Gov't Sent'g Mem. at 2, ECF No. 527 ("[Defendant] obtained much of his work through an associate of [Motovich,] David Gobioff[.]"); Def.'s Sent'g Mem at 2, ECF No. 525 (indicating Defendant "relied on Gobioff for work[.]"). Motovich pressured Defendant, who Defendant relied on for his livelihood, to open several shell company bank accounts in Defendant's name. PSR ¶ 24. In total, Defendant was a signatory on five shell company bank accounts, as well as on one personal bank account in his own name controlled by Motovich. *Id.* ¶¶ 22, 24. Defendant opened the accounts and gave control to Motovich, in part,

amount greater than $1,000[.00] for any person on any day in one or more transactions[.]" PSR ¶ 13 (first and second alteration in original).

[3] Defendant reported immigrating to the United States in 1979 but reports from U.S. Immigration and Customs Enforcement indicate Defendant's entry date was March 4, 1988. Sec. Add. PSR ¶ 65.

because he believed he would receive work from Motovich if he complied. *Id.* ¶ 24. Defendant also feared Motovich would make it difficult for him to receive work in the Midwood area if he disobeyed. *Id.*

For several years, Defendant routinely visited the Midwood Lumber office to sign dozens of blank checks for the accounts opened in his name. *Id.* Motovich used these checks to assist with the check-cashing scheme. *See id.* At Motovich's direction, Defendant also approved wire transfers from the accounts. *Id.* However, Defendant was not aware of how much money passed through the accounts, nor what the funds were being used for. *Id.* Although Defendant's name was on the accounts, Motovich maintained full control over their activity and use. *Id.*

Throughout Defendant's involvement, Motovich and his secretary, Marina Kuyan ("Kuyan"), forged Defendant's name on fraudulent invoices provided to customers of the Midwood Check-Cashing Business. *Id.* In total, Motovich moved over $25 million dollars through accounts associated with Defendant's name. *See id.* ¶¶ 23–24.

On at least one occasion, a victim of Motovich's scheme reached out to Defendant after learning his signature had been forged, and asked Defendant to stop. *See id.* ¶ 19.

**B. Procedural History**

*1.* *<u>The Instant Case</u>*

On August 28, 2021, the Government filed a two-count complaint against Defendant. Compl., ECF No. 1. The same day, Defendant was arrested by agents from the Department of Justice, arraigned before Magistrate Judge James R. Cho, and released on bond. PSR ¶ 33; Aug. 28, 2021 Min. Entry.

On September 22, 2021, a U.S. Grand Jury returned an eighteen-count indictment (the "Indictment") against Defendant, Motovich, Kuyan, and Joshua Markovics ("Markovics")

(together with Defendant, Motovich, and Kuyan, "Defendants"). *See generally* Indictment, ECF No. 19. In relevant part, Counts Four through Six alleged Defendant engaged in bank fraud in violation of 18 U.S.C. § 1344; Count Seven alleged Defendant engaged in conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349; and Count Seventeen alleged Defendant engaged in conspiracy to defraud the United States in violation of 18 U.S.C. § 371. Indictment ¶¶ 30–33, 40–42. The Indictment also included criminal forfeiture allegations as to all counts against Defendant. *Id.* ¶¶ 47–50.

On March 3, 2022, Defendant pled guilty to Count Seven of the Indictment. *See* Plea ¶ 1.

2. *Pleas, Verdicts, and Sentencing of Co-Defendants*

On May 17, 2024, Kuyan pled guilty to one count of bank fraud in violation of 18 U.S.C. § 1344. Kuyan Plea Agreement ¶ 1, ECF No. 240. On May 29, 2026, Kuyan was sentenced to time served to be followed by one year of supervised release and mandatory restitution. *See* Kuyan Sent'g Mem. and Ord. at 1, ECF No. 516.

On July 2, 2024, Markovics pled guilty to Count Seven of the Indictment. Markovics Plea Agreement ¶ 1. On April 24, 2026, Markovics was sentenced to thirty months' incarceration to be followed by one year of supervised release, a $10,000.00 fine, and $330,552.00 in mandatory restitution. *See* Markovics Sent'g Mem. and Ord. at 1, ECF No. 509.

Motovich proceeded to trial on July 8, 2024. On July 30, 2024, Motovich was found guilty on sixteen of the eighteen counts charged in the Indictment. ECF No. 349. On November 19, 2025, he was sentenced to 180 months' incarceration to be followed by two years of supervised release, and mandatory forfeiture and restitution. Motovich Sent'g Mem. and Order at 1, ECF No. 451. Motovich's challenges to forfeiture and restitution remain pending. *See* ECF Nos. 469, 476.

## II. Legal Standard

Congress set forth the procedures for imposing a sentence in a criminal case in 18 U.S.C. § 3553. Together with 18 U.S.C. § 3553, the Guidelines operate as the "starting point and . . . initial benchmark" for a court evaluating a criminal sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007). If and when a trial court chooses to impose a sentence outside of the Sentencing Guidelines range, the court "shall state, in open court, the reasons for its imposition of the particular sentence, and . . . the specific reason for the imposition of a sentence different from that described" in the Guidelines. 18 U.S.C. § 3553(c)(2). The court must also "state[] with specificity" its reasons for so departing "in a statement of reasons form." *Id.* The court's statement of reasons "shall be a simple, fact-specific statement explaining why the guidelines range did not account for a specific factor or factors under § 3553(a)." *United States v. Davis*, 08-CR-332, 2010 WL 1221709, at *1 (E.D.N.Y. Mar. 29, 2010) (Weinstein, J.) (internal citation omitted).

When determining the appropriate sentence, the Court must consider seven different factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed; (3) the kinds of sentences available; (4) the kinds of sentence and the sentence range established by the Guidelines; (5) any pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records found guilty of similar conduct; and (7) the need to provide restitution to victims of the offense. *See* 18 U.S.C. § 3553(a). The Court now addresses each factor in turn.

## III. Analysis

### A. The Nature and Circumstances of the Offense and the History and Characteristics of Defendant

#### *1.* *Family and Personal Background*

Defendant was born on June 7, 1958, in Plav, Montenegro, to the marital union of Faco and Emira Sarkinovic. PSR ¶ 62.

Defendant was raised by both parents prior to his father's passing in 1965 from an accident while attempting to rescue individuals in a lake. *Id.* ¶¶ 62, 64. His father worked in construction prior to his death and his mother worked in agriculture. *Id.* ¶ 64. Defendant grew up in a low-income household but his "basic needs were always met." *Id.* Defendant described a "good, normal" childhood, devoid of abuse. *Id.* Defendant's mother passed away in 2017 of natural causes. *Id.* ¶ 62.

Defendant has four living siblings: Ferka, age seventy-seven; Bajazit, age seventy-four; Ferid, age seventy-two; and Hamdija, age seventy. *See id.* ¶ 63. Defendant's brother, Becir, died in 2019 of natural causes. *Id.* Defendant reported good relationships with each of his living siblings, all of whom are aware of the instant case and remain supportive. *Id.*

Defendant has been married to his wife, Senada, for over twenty years. *Id.* ¶ 66. Senada is a homemaker in good health. *Id.* They have two children together: Merdin, age twenty-two, and Dina, age eighteen. *Id.* Defendant reported a close relationship with his wife and children, all of whom are aware of the instant case and remain supportive. *Id.*

Defendant was previously married to Nusreta Radomcic for approximately ten to fifteen years. *Id.* ¶ 67. Despite their separation, Defendant reported maintaining a "good friendship" with Radomcic. *Id.* They have three children together: Hako, age thirty; Miralem, age twenty-eight; and Minela, age twenty-six. *Id.* Following their separation, Defendant and Radomcic shared custody of their children and took turns paying child support to one another depending on with whom their children were predominantly residing. *Id.* All Defendant's children with Radomcic are aware of the instant case and remain supportive. *Id.*

Defendant reported he immigrated to the United States in 1979 due to political turbulence in the former Yugoslavia. *Id.* ¶ 65.[4] He became a naturalized citizen of the United States on June 27, 1996. *Id.*

2. *Educational and Employment History*

Defendant graduated from high school in the former Yugosalvia. *Id.* ¶ 73. He attended college for two years in Montenegro before "his education was interrupted by the political climate" and he decided to immigrate to the United States. *Id.*

As previously discussed, Defendant has worked as a self-employed handyman since he emigrated to the United States. *Id.* ¶ 75. After the COVID-19 pandemic, Defendant has only worked part-time. *Id.* He reported earning an average of $35,000.00 per year. *Id.* Defendant also previously worked as a building superintendent for an unspecified period of time but later transitioned to subcontracting work. *Id.*

The United States Probation Office ("Probation") indicated Defendant appears unable to pay a fine. *Id.* ¶ 79.

[4] *See supra* n. 3.

3. *Prior Convictions*

Defendant has no prior convictions or arrests, and no other pending charges against him. *Id.* ¶¶ 55–60.

4. *Physical and Mental Health*

Defendant is healthy and reported no history of health problems. *Id.* ¶ 70. Defendant also indicated he has no prior or current mental health issues. *Id.* ¶ 71.

5. *Substance Abuse*

Defendant reports no history of alcohol use or illegal drug use, nor any substance abuse. *Id.* ¶ 72.

**B. The Need for the Sentence Imposed**

The second § 3553(a) factor instructs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]" 18 U.S.C. § 3553(a)(2).

The Court's sentence recognizes the seriousness of Defendant's conduct. As the Government noted, Defendant knew he was lying to banks about who controlled his accounts, which were ultimately used to help carry out the Midwood Check-Cashing Business. *See* Gov't Sent'g Mem. at 2. The Court's sentence will deter Defendant and others from engaging in similar conduct, justly punish Defendant for his crimes, and protect the public from Defendant's actions. Accordingly, the Court's sentence is "sufficient, but not greater than necessary" to comply with the purposes set forth in this factor. 18 U.S.C. § 3553(a)(2).

### C. The Kinds of Sentences Available

The third § 3553(a) factor requires the Court to detail "the kinds of sentences available" for Defendant. 18 U.S.C. § 3553(a)(3).

Defendant pled guilty to one count of conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349. Plea ¶ 1. Defendant faces a maximum term of thirty years' incarceration and no minimum term. 18 U.S.C. § 1344. Defendant also faces a maximum term of five years of supervised release. 18 U.S.C. § 3583(b)(1). If a condition of release is violated, Defendant may be sentenced to up to three years of incarceration without credit for pre-release incarceration or time previously served on post-release supervision. 18 U.S.C. § 3583(e)(3).

In addition to facing terms of incarceration and supervised release, Defendant faces a maximum fine of $1,000,000.00, *see* 18 U.S.C. §§ 1344, 1349, and a mandatory $100.00 special assessment, 18 U.S.C. § 3013(a)(2)(A).

### D. The Kinds of Sentence and the Sentencing Range Established for Defendant's Offense

The fourth § 3553(a) factor requires the Court to discuss "the kinds of sentence and the sentencing range established for . . . [t]he applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[.]" 18 U.S.C. § 3553(a)(4)(A).

All parties agree Defendant has a Criminal History Category of I. Third Add. PSR ¶ 81, ECF No. 529; Gov't Sent'g Mem. at 3; Def.'s Sent'g Mem. at 5.

Probation states the applicable Guideline provision is U.S.S.G. § 2X1.1, which directs the Court to apply the base offense level for the substantive offense. PSR ¶ 46. Here, the base offense level for the substantive office—bank fraud—is found in U.S.S.G. § 2B1.1. *See* U.S.S.G. § 2X1.1(a); *see* PSR ¶ 46. U.S.S.G. § 2B1.1(a)(1) calls for a base offense level of 7 if the "offense of conviction has a statutory maximum term of imprisonment of 20 years or

more[.]" *See* 18 U.S.C. § 1344 (prescribing a maximum term of incarceration of 30 years); Third. Add. PSR ¶ 46.

Probation also notes certain mitigating factors should apply.[5] First, Probation states a two-level reduction for the timely acceptance of responsibility is appropriate pursuant to U.S.S.G. § 3E1.1(a). Third Add. PSR ¶ 52; *see also* Plea ¶ 2.

Probation finds an additional two-level reduction is appropriate because Defendant is a Zero-Point offender pursuant to U.S.S.G. § 4C1.1(a) and (b). Third Add. PSR ¶ 53.

Finally, Probation finds a four-level reduction is appropriate because Defendant qualifies as a "minimal participant" pursuant to U.S.S.G. § 3B1.2(a). *Id.* ¶ 49.

All parties provide the same Guidelines range. Pursuant to the Guidelines Sentencing Table, a Total Adjusted Offense Level of 1 combined with a Criminal History Category of I results in a Guidelines range of zero (0) to six (6) months' incarceration. U.S.S.G. § 5A; Comment 2 to U.S.S.G. § 5A ("A total offense level of less than 1 is to be treated as an offense level of 1."); Third Add. PSR ¶ 81; Def.'s Sent'g Mem. at 1 (noting Defendant "faces the lowest possible [G]uidelines range of [zero to six] months' imprisonment[.]"); Gov't Sent'g Mem. at 3. The Guidelines range is subject to a thirty-year statutory maximum pursuant to 18 U.S.C. § 1344. Plea ¶ 1. This Court appreciates the sentencing arguments raised by all parties and seriously considered each in turn.

---

[5] Defendant and the Government do not provide an explicit calculation of each element of the Guidelines range but appear to object solely to Probation's initial application of the U.S.S.G. § 2B1.1(b)(11)(C)(i) enhancement. Def.'s Obj. to PSR at 1, ECF No. 22 (objecting only to application of § 2B1.1(b)(11)(C)(i)); Def,'s Sent'g Mem. at 4 n. 1 (same); Gov't Sent'g Mem. at 3 (same). Probation removed this enhancement in the Third Addendum to the PSR. *See* Third. Add. PSR ¶ 47.

**E. Pertinent Policy Statement(s) of the Sentencing Commission**

The fifth § 3553(a) factor requires the Court to evaluate "any pertinent policy statement . . . issued by the Sentencing Commission." 18 U.S.C. § 3553(a)(5).

Both the Government and defense counsel drew the Court's attention to U.S.S.G. § 5K1.1. *See* Def.'s Sent'g Mem at 5; Gov't Sent'g Mem. at 5–6; Real Time Tr. at 11:17–19, 22:14. This Court appreciates and seriously considered the policy statement raised by the parties. Finding no other pertinent policy statements on its own, the Court proceeds to the next § 3553(a) factor.

**F. The Need to Avoid Unwarranted Sentence Disparities**

The sixth § 3553(a) factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6).

Defendant argues a time-served sentence with no term of supervision would avoid sentencing disparities because: (1) U.S. Sentencing Commission data does not provide any insight on similarly situated defendants in other cases; and (2) similarly situated co-defendants in this case received comparable "non-jail sentence[s]." Def.'s Sent'g Mem. at 5–6.

For the reasons stated in this Memorandum and Order, and considering the other six § 3553(a) factors, the Court's sentence avoids unwarranted sentencing disparities.

**G. The Need to Provide Restitution**

Finally, the seventh § 3553(a) factor requires the Court to touch upon "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7). The Government does not seek restitution from Defendant in this case.

## IV. Conclusion

For the reasons set forth above, the Court sentences Defendant to time served and a $100.00 mandatory special assessment. This sentence is sufficient, but not greater than necessary, to accomplish the purposes of § 3553(a). The Court does not impose a fine given Defendant's present financial circumstances.

The Court expressly adopts the factual findings of the PSR and addenda thereto, as corrected herein, to the extent those findings are not inconsistent with this opinion. The Court advises Defendant he has fourteen (14) days to appeal the order and judgment of this court from the date the order and judgment are entered.

**SO ORDERED.**

**s/WFK**

HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: September 16, 2026
Brooklyn, New York